Good morning, Your Honors. Janet Tong, Federal Defenders, on behalf of Mr. Farias. There's two issues raised in this case, and what I'd like to do is say a few words on the Ferreta issue. And, of course, I could answer any questions on sentencing if Your Honors are interested. And let me really cut to the heart of the issue here. Once an unambiguous invocation of the right to self-representation is made, there must be an unambiguous resolution of that request, or else an unambiguous withdrawal. And here, there's no question that Mr. Farias unequivocally invoked his right to self-representation. He said, Your Honor, I'd like to go pro se. There's no dispute on that point. And if you read the record the way that I do, which is that he never, he never equivocated and he never withdrew that request to represent himself. But he said, let me talk to my lawyer. Your Honor, that was much later. And I was just about to address where you're coming from, Your Honor. And what I was going to say is this. If you read the record the way that I do, the district court failed to follow the Hernandez and Mena's requirements that there be a full-threaded hearing. And his conviction must be reversed on that ground. But even if you read the record the way the government does, and the government says that Mr. Farias either withdrew his request or equivocated in some way, and I actually think the language they focus on is where Mr. Farias actually says something to the effect of, you're right when the district judge is telling him that he's not as good as his appointed lawyer. If you read the record the way the government does, that it's equivocation or maybe even withdrawal, even if you do it that way, the district judge, it was an error of law to do what the district judge did because he violated the forever right and the doctrine of unconstitutional convictions. And the reason for that is because the district judge expressly conditioned his right to represent himself, that Sixth Amendment forever right, it conditioned that on relinquishing his right to adequate time to prepare. And that's, you know, I mean, there's no other reading of the record to accept that reading. And what the district judge says is he says this four times. He says, Mr. Farias, you have a right to represent yourself. I'm not going to tell you you don't. I'd like to go through some more discussion with you if that's what you choose to do. But your case is going to go to trial tomorrow. We're going to call a jury to try the case tomorrow. And I don't know if you're ready to try the case tomorrow. That's what it said. And then you go about a page later in the transcript and he says the same thing again. I want to emphasize to you, you have a right to do it, meaning represent yourself, if that's what you want to do. But it's not going to forestall your trial. Your trial is going forward tomorrow. And United States v. Robinson says that there is a constitutional right, a tenet to the forever right, to adequate time to prepare. In the record show, was this the first time that he indicated that he wanted to represent himself? Yes, it is, Your Honor. And that's because this is the first real substantive hearing that Mr. Farias appeared before District Judge Burns. There was only one previous hearing. That was a motion hearing trial setting date. And, Your Honor, let's go forward, let's go by in about 30 seconds. They pick a trial date. They pick a motion hearing date. And that's the end of it. This is the first opportunity he was really face-to-face with Judge Burns. There's also, just to hit the point, there's also no suggestion that this was untimely in any way. There's no suggestion that there was any undue delay. And there's certainly no finding on that, to that regard. Nothing the lower court said would indicate that he thought he was doing this just to delay. That's correct, Your Honor. Was your client in custody at the time? Yes, he was. Yes, he was. He was in custody. So there's no advantage to delay. There certainly was no advantage to delay. Especially, you know, frankly, Your Honor, Mr. Farias had a very, very strong view of the merits of this case. So there wasn't any real advantage to delay in his view. You know, the progression of this case. How long did he know in advance of the trial date? So he'd known that the date was there for a long time. Is that right? Your Honor, I'd have to look to see exactly when the trial-setting hearing was. And I could... Well, you can look it up when... I could do that, certainly, Your Honor. But unless there are any other specific questions, I would just reserve the remainder of my time. You had an issue with respect to the sentencing. Yes, Your Honor. Do you want to address that? I'd be happy to. The sentence, if Your Honor's reached the sentencing issue in this case, the sentence here was substantively unreasonable because it exceeded the maximum amount of sentence that was permissible under 18 U.S.C. section 3553. And that's because the district court here made an explicit finding that 5 years in custody, not... That's 5 years. That's 60 months in custody was the sufficient but not greater than necessary time. And the district judge used those words, sufficient but not greater than necessary. And that's a direct... Supreme Court's called the overarching sentencing principle. And what that is, is it's a ceiling on the amount of time. The district judge is supposed to impose a sentence that is not greater than necessary. So once he finds a sentence, which is 5 years in this case, that's not greater than necessary, he can't do what he did here, which was look over and look over into the future at a speculative event in the future, which was... Possible good time credits. Earn all the good time that he could. Earn all the possible good time that he could. And he took that number and he just sort of increased the sentence and used it to offset, you know, anything, the maximum possible time that Mr. Flores could earn. And good time credits are, they are by statute a discretionary province of the BOP. And Congress really did take a, I mean, you can see in the statute that Congress said district judge sentencing, you are responsible for sentencing. And we're putting it over here in section 3553. And BOP, you're responsible for good time credits. And we're putting it over here in 3624. Have you looked at the Supreme Court case Weaver? I'm sorry, no. Weaver? Weaver. I don't think so, Your Honor. In that case, it said, we have previously recognized that a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed. I'm not familiar with that case. I don't know what the date is of the case and whether it's before the amendment of the statute. It's an old case, but that's what our Supreme Court has said through Justice Marshall writing the opinion. Your Honor, I'd have to go back and look at that case specifically. But the good time credit statutes were actually amended in, I believe, the 90s. And then I think the congressional intent is clear there that Congress was creating a separate scheme of good time credits. And the actual language of the statutes say that it's discretionary. The word they use is may. There's may language in there that the BOP may grant these credits. And the Seventh Circuit has held that for a district judge to offset the full amount of good time credits in calculating a sentence violates the congressional intent of setting up those statutes. And that's in a more recent case. That's in a post-mid-90s case that it's done that. Is this a common practice among the district court judges, among the district judges in San Diego? Your Honor, to be honest, I don't know how common the practice is. I'm in the appellate department. I'd have to ask the trial-level attorneys what the, you know, how common it is. But my understanding is that it does happen from time to time.  You know, along the way the judge said, well, he wanted to make the serving, he used the word actually. Actually serve, I think was the word he used. Yes, Your Honor. Five years would be sufficient. Right. Does that, I mean, does that cure any problems? It doesn't, Your Honor, because there's a substantial chance that Mr. Farias will serve actually more time in custody than five years because he's actually given a 68-month sentence. If he doesn't get a full eight months of credit, of good-time credit off, he will in fact serve more than that five years in custody. And that, by definition, and that's statutory definition, or 3553 talks about sufficient but not greater than necessary. By definition, 61 months will be greater than necessary, and that will violate the statute. Okay. I'd like to remember. I'll give you a minute for rebuttal.  Thank you.  Thank you, Your Honor. George Madahan, United States. May it please the Court. Very briefly in answer to your question as defense counsel, Judge Fletcher, it was on December 8, 2008, that the Court set the trial date of January 13, 2009, and the motion eliminate date the day before, January 12, 2009. So about five weeks, it appears to me. Regarding the issue of whether the district court failed in its duty to go through what Feretta requires. Counsel indicated that this was his real first chance to talk to the judge, to ask to the judge what the motion means. Is that correct? Well, he would have been present at that December 8 motion hearing. There was no other motion hearings in front of the judge. That was December 8. Yes. And the trial was set for when? Yes. He was, a complaint was filed on September 30. The indictment was filed on October 28, about a month later. About five weeks after that, December 8, Mr. Farias appears before the district court during the motion hearing. A trial date is set. A motion eliminate hearing is set. And then five weeks later, he appears again. Now, he could have. When was the motion eliminate ruled on? On the day before trial, January 12, 2009. Now, the Court. I assume it was denied. The motion to pussy pro se? No. The motion to eliminate. Well, the various motions, there were various motions to eliminate files. Some were granted. And they were ruled on. They were ruled on. And that was when the defendant asked to represent himself. It was very early on in the hearing. So I believe it was before they were ruled on. The same day. It was the same day. That's correct, Your Honor. The important point. Mr. Farias says, I want to represent myself. Right away, the district court says, that's up to you whether to do it. Admittedly. And then the court said, as it's required to do. It says, I don't think that's a good idea. And it goes on for a little period of time. The court also says, if you want to represent yourself, there's more stuff I've got to tell you. And then he says that twice. And then one time he adds, including the maximum sentence. The court was well aware of what it needed to do. If Mr. Farias was kept saying that he wanted to represent himself. What about the obligation to let him have time enough to prepare? First of all, in the papers, defense relies on the Scott decision. It says, the fact that the court didn't allow continuance violates the unconstitutional conditions. And I don't think Scott is the right rubric to look at this decision under. In Scott, the district court gave the defendant a choice. You either accept the Fourth Amendment waiver, and we let you out pretrial. Or you don't accept the Fourth Amendment waiver, and we don't let you out pretrial. That's not what happened here. It's not like the court said, if you keep your attorney, I'll give you a continuance.  No, it's different. He said, regardless of whether you keep your attorney or don't keep your attorney, we're going to trial. And that's the difference between Scott. That might discourage a cautious defendant about whether or not he wants to represent himself. So basically what the court did is preemptively denied a motion to continue. So it shouldn't be held against a defendant that didn't actually make a motion to continue. Because, again, the district judge basically preemptively denied it. No, but he essentially said to the defendant, sure, you can represent yourself. I hope you're ready for it tomorrow morning at 9 o'clock. Right. And that decision is. . . That's a kind of silly and terrible decision, isn't it? And that decision is reviewed by this Court for an abuse of discretion. And. . . Why wouldn't that be an abuse of discretion? Well, there are a number of reasons why it's not an abuse of discretion. First of all, because when you're looking at a continuance request and whether a discretion is abused, you have to look at how diligent was the defendant in making that request. Assuming that he would have made the request other than the preemptive denial of it, that request would have been made at the soonest, 19 hours before the trial was set to begin. And that would have been made not diligently at all. He could have made that request at any time previous to that. But more importantly. . . Could the Court's rulings on the motions in limine have figured into his decision to represent himself or not? It certainly could, couldn't it? Again, but since I don't think the Court ruled on the motions. . . Actually, now I remember. The Court said once the defendant chose to go bench trial, the Court said, I'm not even going to worry about the motions in limine. It's adoring the trial. So the Court hadn't ruled on the motions in limine yet when that decision was made. But the more important fact is, in order to show abuse of discretion, the defendant would have to show that he was prejudiced by a denial of a motion to continue. And that's. . . In this context, I don't think that applies. Well, let me try to dissuade you, Judge Fletcher, because the Court goes through on supplemental exercise of the record, page 102, what the evidence was. There was no question the defendant was attempting to enter. He's found at night, you know, on the floor of the backseat of the car with covers and blankets over him. Now, what's that got to do with whether you give a continuance? Because what was a continuance going to accomplish? He has to show prejudice. The evidence was overwhelming, and the defendant eventually admits, yeah, on page 40. . . 13, I was trying to cross illegally. And then later he says, I came back because I wanted to see my daughter. A continuance wouldn't have helped him at all. Furthermore, Mr. Farias continuously let us know before trial and months after trial what he was concerned about, and that was collaterally attacking his deportation. That's the only thing he cared about, and the only thing that a continuance would have had anything to do with. And as the judge correctly described at the hearing, that has nothing to do with the facts of the trial. It's not an element of the trial. It's a 13-2016 motion. It's totally separate. As a matter of fact, the Court didn't even rule on it until after the trial. So there is no way that the end, by the way, Mr. Farias hasn't even attempted to show how he was prejudiced by lack of continuance. He hasn't talked about what evidence would he have looked for, what other strategies would he have accomplished, because there's nothing. He was guilty. He wanted to represent himself. He did. Well, of course. And the Court said, sure, you can represent yourself, but let me tell you, 9 o'clock tomorrow morning. Right? Well, and, you know, Mr. Farias never said, well, that isn't enough time. You know, I actually would want more time. But, again, the important point is he could have gotten two years. It wasn't going to change anything about this case. Moving on to the sentencing. But the issue was whether he would continue to represent himself, not the result of the trial. The issue, I think, is whether the district court abuses discretion by not allowing a continuance. And in order to show abuse of discretion, the defendant would have to show how he was prejudiced by that decision. Did the question of the continuance come up other than the judge saying, you're not going to get more? Well, it actually did. Mr. Farias, Ms. Tong's colleague and federal defender, said, well, I would like a continuance so we could rule in the 1326D motion yet. And the judge said, well, I could rule in the 1326D motion after trial. And he says, I'm ready to go. Are you ready to go, Mr. Farias? Mr. Farias says, yes, I am. And that was the basis. I hope you got it. There was an errata to the supplemental extracts of record filed about a week ago. Basically, the court reporter just got it wrong. Who said, I'm ready to go? But it's clear. I mean, the judge was saying, you're ready to go, Mr. Farias, aren't you? And the court reporter initially put that Mr. Ficori, Mr. Farias's attorney, said, yeah, I'm ready to go. But it was actually the defendant who said, I'm ready to go tomorrow. So it did come up again in that context. Briefly on the sentencing issue, the main issue is whether courts can consider a good time, whether that's permissible under 3553A. And I don't know how it works in your court, Judge Walsh, but frequently courts sentence to 12 months and a day because they're taking into consideration good time credits. And if you find otherwise Well, you need to make sure that the defendant gets good time credit. You have to have more than one year. That's right. They're taking it into consideration. And if you find that the courts can't That'll be different than saying, well, I want to make sure he's served 15 months, so therefore I'm going to give you 18 months. Can I answer that question? Sure, go ahead. I don't think it's different because the question comes down to 3553A.3. When district courts are allowed to consider the type of sentence available, are they allowed to consider how much good time credit? So basically what all the court was saying was even if you're a model prisoner for your crime, you should serve at least 60 months. And if you're not a model citizen, it will be 68. But when I give a year and a day, I'm not demanding that the Bureau of Prisons give him the good time. I'm merely making him eligible for it. I'm still functioning as an Article III. When I start on the other end of it, it seems like I've drifted over into the executive branch of government and I don't belong there. The district court had the ability to consider the good time credits, and this should be reviewed for plain error since this is not a substantive appeal. This is a procedural appeal which was not raised before the district court. Thank you. Okay. I believe you have a minute. Yes, you have a minute. I can't even stay within that minute. I'll try at least. Just real quick, a couple points in response to what the government said concerning the timing and the continuance issue. One thing that the government highlighted is the government said the only issue was the collateral attack on the deportation, and that's going to be handled after trial. And I want to point out just something in the record, and it's on page 14 of the transcript. What the district judge said in this case is because it's a bench trial, quote, all permit the collateral attack to be argued during the course of the trial. So that was an issue at the trial, and that's what Mr. Farias was more interested in preparing for and personally litigating, more than anything. And just also real quickly, I think Judge Fletcher, either you or Judge Paez, I heard making the point that, and I agree with this point, is that even if we're talking about, like, abusive discretion or framework, this Court's cases say over and over again that the failure to exercise discretion is itself an abusive discretion. And I think the government also mentioned something else that also, you know, I think speaks clearly to this point, is the government was asked whether Mr. Ficori, whether the defense counsel, I think, asked for continuance, and it was, in fact, denied. And if you do look through the transcript, I think that's on page 14 or 15 of the transcript, that does happen. And what that highlights is that there was never a reason given by the district court why the trial couldn't be moved a day, half a day, two days, never. In all the courses of saying it must go forward tomorrow, there's never, ever a reason given. Well, you know, the one thing that's interesting about that was the counsel didn't say to the judge, you know, Judge, I think he still wants to go pro se. You better continue on with the advisement. That's right, Your Honor. And I think speaking from defense counsel perspective, it's a very tricky place for a defense lawyer to be because, I mean, perfectly honestly, from our point of view typically, we don't think it's in the client's best interest to go pro se. And it's, we don't want to, but we recognize that it is a constitutional right. And we don't want to insert ourselves to, you know, it's very tricky. It's a balance between best interest and what we believe to be the best interest in an actual constitutional right. So it's a hard place to be. And I only have one final point that I just wanted to mention that I think, Judge Walter, you were headed towards, or you might have actually made this point, and I actually firmly agree with you on it, is that, you know, in the time that between the trial setting, the date, the setting of the trial date and this hearing, there's no reason to believe that Mr. Farias would have been dissatisfied with the performance of his attorney before we even saw much performance of his attorney. So this was, you know, really, really quite timely. And unless your honors have any further questions, I think I've actually, yeah. You're over the minute. I broke my promise. Two minutes.  Very sorry. Thank you. Thank you, your honors. Can I just correct one error? That's okay. We've got it all. We've got the record. We'll read it. Okay? I'm fine. Whatever. Okay, sure. Okay? We'll take up the next one. I'm sorry. Chavez versus Rancho Santiago Community College District is the next case for argument. It will be Mr. Freeman. Yes, Your Honor. Go ahead. Good morning. I will try and get right to it. And you're Richard Freeman, right? Yes, Your Honor. Okay. This Court must decide whether a State agency can avail itself of the market participation exception to otherwise Federal preemption, even where it cannot demonstrate, in the context of a hearing on a motion for summary judgment, that its conduct would be legal if done by a private party. The National Right to Work Foundation's amicus brief lays out these legal issues very carefully for you. I know my time is short. I want to point out some factual predicates that are not present for the district court to be able to make the decision that it made. Point number one, the district court had already found that there was a triable issue of fact as to whether or not this type of an agreement would have been entered into by private parties as a practical matter. And there was expert witness testimony on it. And so the district court found that the school district had not met that test. Secondly, the — That was only as to one prong of the test. One prong, Your Honor. Correct. Secondly, the district court found that the school district was not primarily engaged in the construction industry. Point number two. Point number three is that — Why is that material? Because, Your Honor, the school district here is trying to fit itself within an exception to otherwise federal preemption, which is the market participation exception. Well, I understand that, but — Okay. And the second prong, Your Honor, is that in order to fit within the market participation exception, and this is the most important point that I want to make this morning, the school district would have to be acting legally as a private party would be acting. The Supreme Court in Boston Harbor went to great lengths to discuss how the Massachusetts Water Authority, if it had been a private party, would have been acting legally within the meanings of Section 8E and Section 8F of the National Labor Relations Act, which are the secondary boycott provisions. It's important for you to understand what we're dealing with here is a refusal-to-deal agreement. And private parties — You characterize it that way, but why isn't it simply an agreement exclusively to use X? Well, the National Labor Relations Board and the circuit courts, Your Honor, have over and over again ruled that what we call union signatory clauses, which is the party is agreeing only to deal with union security — excuse me — union signatory contractors, is a refusal-to-deal clause. It is a boycott clause because it is a clause that excludes everyone other than those that you have agreed to deal with. Those are secondary boycotts. Those are illegal, other than a very narrow exception in the construction industry. And the two prongs in the construction industry that must be met in order for a private party to meet that are, one, you must be an employer in the construction industry. And the district court did not find that the school district was — would have been an employer in the construction industry. And there is no evidence in the record that the school district would have been an employer in the construction industry. And that standard for being an employer in the construction industry is that you, the entity here, the school district, would have to be exercising active control over labor relations on the job sites. Absolutely no evidence there. And it's important for your honors to understand that what we're talking about here is in order to meet the — which is what they call the section — the proviso, that is an affirmative defense. And it's very important for you to understand that. That is not something that we have to prove as the appellants. That's something that the school district had to provide evidence of at the district court level. That evidence was not there. There was no finding to that effect. And there couldn't be because it is not an employer in the construction industry. That's why you are faced with this issue. Can a school district, which has no collective bargaining relationship with the building trades, what's called a stranger union, condemned in the Connell case, can it enter into a refusal-to-deal provision that would otherwise be illegal if they were acting as a private party? And we — I assert to you that you cannot find that conduct that would be illegal in the private sector could be legal in the public sector so as to characterize — The point that you keep making right there, where is it in the Supreme Court's — Decisions? Yeah. Boston Harbor would be the focus. Which part of Boston Harbor? The discussion in Boston Harbor about how there could be no question that the circumstances in Boston Harbor met Section 8E and Section 8F because Kaiser was the entity, not the public entity, that negotiated the project labor agreement in Boston Harbor. Kaiser was a giant contractor in the business of the construction industry exclusively, and the Supreme Court emphasized that. There was no reason for the Supreme Court to go into why Section 8E and Section 8F were complied with in Boston Harbor if it didn't have any meaning. Let me ask you this. Did the Boston Harbor — I forget what they were called, the authority there. The Massachusetts Water Authority or something. Did they adopt themselves the agreement? They put it into a bid specification, but they didn't enter into the agreement itself. What's the difference? The difference itself is that the union here went to the entity that it had no collective bargaining relationship with and that was not in the construction industry. What the school district has to do here, Your Honor, is fit itself into a very narrow exception as an affirmative defense to avoid trial in this case, and that's what we're talking about here. We're asking you to send this case back for trial. They have to show that there are no material disputed facts and that based on those undisputed facts they're entitled to judgment as a matter of law, and that's basically what the district court did here. But the district court, as we pointed out in our briefs, did not make the requisite findings. It'll make findings. Well, there wasn't evidence before the court. What the district court judge does is looks at everything that's been presented to him and says is there a genuine factual dispute here that precludes summary judgment? Well, Your Honor, if you look at footnotes 5 and footnotes 6 in the first motion for summary judgment decision that the court held where it rejected summary judgment and said we would be going to trial, the district court judge said that we would be trying those issues. Then when we got to the second phase, he didn't address those issues, and there is no evidence, Your Honor, to establish the affirmative defense of fitting within the proviso of Section 8E. And so it's just there is no evidence. Let me ask you this, and then tell me what facts, if you were to go back to trial, what facts are in dispute? Number one, that the school district is an employer in the construction industry. If it's not, then it couldn't enter into the proviso. Number two, that there was a liberty and property interest here. The district judge essentially made a... I said facts. What are the facts? What's the story? One of the things that is a fact is what is the burden that would be put on the apprentices They had a contract with the state. They were not allowed to work on these jobs. They were absolutely excluded from a boycott standpoint. And thirdly, whether or not this agreement was entered into pretextually. The other argument that the... As I recall, there were some projects within the district that they could work on. Small projects, yes. So they could pursue their training, right? Just as in the Brown case last year, where the Supreme Court reversed the Ninth Circuit, they had minimum thresholds in that statute as well. Counsel, not only could they work on the little projects, but they could work on any projects that didn't involve e-bonds. Yes, but there were no other monies for the school district for that three-year period. This was the whole ballgame. And the courts were required to look at what the practical effect of the state action is. And the practical effect here was it was tantamount to a regulation, because they essentially said all of our construction work is going to be done under these rules of the game. And those were refusal-to-deal rules, which exclude non-union apprentices and non-union apprenticeship programs. But, Your Honor, to follow up on the pretext issue, in the Milwaukee Metro case cited in the footnote in the court's first decision, in this case denying summary judgment, the court points out that just expressing a purpose, if it's pretextual, is something that requires a factual inquiry. It's our position, based upon the entire body of facts that were in this case, that this was a political payoff, number one. And number two, that just because there was boilerplate in the PSA that they were trying to avoid labor strife was pretextual. And there was no history of any labor strife in this circumstance. There was no evidence introduced whatsoever that indicated that the parties had negotiated with a concern for labor strife. But there was a no-strike clause. Correct. But there was no schedule. Unlike Boston Harbor, they weren't under a court order. They had no projects designed. They had no projects that were under a deadline. It was just a vague wish list of work in general over various campuses that might occur. It was very vague in general, which is a far cry from Boston Harbor. Do you want to save some time? I would like to reserve some time, Your Honor. Thank you. Good morning, Your Honors. Ray Vandernat on behalf of the Los Angeles and Orange County Building Trades Council. I'd like to discuss two topics, one of which Mr. Freeman spent most of his time on. The first one deals with the project labor agreement in this case, the PSA. It was tailored and had a very narrow scope. The Supreme Court in both Boston Harbor and in the Brown case emphasized that Boston Harbor and the PLA was, quote, specifically tailored to one particular job, end quote. That job, they found, was the Boston Harbor cleanup. Now, I've never been to Boston and haven't had the opportunity to tour the harbor, but I can imagine that that project probably exceeded more than one building, more than a sewage treatment facility, more than some environmental equipment and facilities to help clean up that harbor. Well, in this case, the PSA was also limited to one particular job, and that was the needed capital improvements for the district's campus. This was clearly narrower than the $6.1 billion that Boston Harbor was going to spend to clean up its job over a 10-year period. Here, the project labor agreement first only was covered by a one-time infusion from the measuree bonds, which were $330-something million, quite less than the $6.1 billion from Boston Harbor. The project labor agreement only applied for three years, much narrower than the 10-year period that the project labor agreement covered in Boston Harbor. And thirdly, it only applied on projects that exceeded $200,000. Thus, the project labor agreement did not apply to all district construction projects, nor did it apply to all district construction projects funded by Measure E. Clearly, this project labor agreement was much narrower than what the Supreme Court approved in Boston Harbor. Nextly, the PSA limited contractors to obligations only for work performed under the project labor agreement under Measure E projects. There was no obligation that any of the contractors or that any of the apprentices could not work on any other project, and there were no obligations they were obligated to go ahead and apply other than to district projects. There's simply no evidence that the project labor agreement sought to affect conduct unrelated to the employer's performance of work on district projects. Instead, as in Boston Harbor, but unlike Gould, the PSA looked only to the contractors dealing with the district and only to Measure E projects. Are you going to address his argument? That's what I'm getting to now, Your Honor. All right. Whether or not a project labor agreement complies with the technical requirements of Sections 8E or Sections 8F of the National Labor Relations Act has no bearing whatsoever in determining whether or not the district was acting as a market participant. Though the determination for that issue is Cardinal Towing and this Court's engine manufacturing decision, which applied the two prongs from Cardinal Towing. Nowhere does compliance with 8E or 8F from the Act fall into that analysis. As the Boston Harbor Court noted, state political subdivisions aren't included under the definition of the National Labor Relations Act. States are specifically excluded from the term employer, which the National Labor Relations Act applies to. It does not apply to the states. Thirdly, the district, when it signed a project labor agreement, was acting in the capacity as a purchaser, not in the capacity as an employer. He insists that they have to themselves be in the construction business. Your Honor, I guess one easy way to go ahead and describe why that doesn't make sense is that would surely put form over substance. If the district could go ahead and hire someone to enter into a project labor agreement with certain unions, why couldn't it do it itself? It wouldn't make any sense that just hiring a contractor, you're allowed to go ahead and do it. Boston Harbor talks about the general goals from the National Labor Relations Act that courts are required to go ahead and look at, not the specific terms. In Boston Harbor, the Supreme Court affirmed a public agency's opportunity to do, as a public agency, what private entities are allowed to go ahead and do. There's no doubt that private entities are allowed to enter into project labor agreements. Additionally, the Supreme Court in Boston Harbor concluded, when the Massachusetts Water Authority, acting in the role of the purchaser of construction services, acts just like a private contractor would act, the conditions it's purchasing upon the very sort of the labor agreement that Congress explicitly authorized and expected frequently to find, it does not regulate the workings of the market forces, rather it exemplifies them. Here again, we're asked to go ahead and be able to distinguish between regulation and market participation. The district in this case was acting as a market participant. It had limited the scope and the obligations from the contractors under the terms of the project labor agreement, and it was acting as any other entity would when dealing with proprietary concerns. Mr. Willey is going to cover other portions. I'm Gregory Willey. I'm appearing on behalf of Rancho Santiago Community College District. I'd like to address a couple of points that plaintiffs did not address, and I'd also like to address one or two that the plaintiff only alluded to. First, we believe that this action is moot because the individual apprentices have fairly clearly, by this time, graduated from the program that they were in. Furthermore, based upon a reading of the PSA, even if one does not consider the Hardash Declaration, which we move to have admitted, it is fairly apparent that the PSA should have expired by this time. But they want damages, and they were allowed to amend to get damages. Yes, Your Honor, but the damages are only nominal, and they were brought in when we raised the mootness issue. I understand that, but the district court did allow that. Now, was that an abuse of discretion? We believe that this court may properly find that this action is moot if that one hesitates to characterize the court's decision, the district court's decision, as an abuse of discretion. I'm not sure I understood that. I think, Your Honor, that this action is moot. If it is necessary to find that the district court abuses discretion in doing so, we believe that based upon the seven words, opinion, which we cite. Did you appeal his order that allowed them to amend the complaint? No, Your Honor. Okay. Second. Is this a case where it might occur again, capable of repetition, and the time frame is so short that it can't be usually adjudicated within the short time frame? I don't think so, Your Honor, for two reasons. First, as I understand that rule, it should be applied to Rancho Santiago Community College District rather than to all potential persons entering into PSAs. Second, this case is unusual in its posture because of the Chamber of Commerce versus Lockyer and ultimately the Brown decision, which substantially delayed the decision in this case while the parties were waiting for a resolution of Chamber of Commerce versus Brown. How long was the case in the district court, then, in total? 2004 to 2009, I believe, Your Honor. That was five years. Some of that time was attributable to the Lockyer case? Much of it was, Your Honor. And how long has it been pending in our court? I frankly don't recall the case number. That's all right. Is it 2008? I can check. Second, plaintiffs alluded to the fifth and sixth clauses of action, violations of due process based on the existence of property and liberty. We submit that the court may properly find that plaintiffs had no property interest in working for the district and that there was no stigma in their not receiving employment and, accordingly, neither property nor liberty is implicated in the action. Finally, with respect to the district alone, we believe that the Eleventh Amendment bars this action, particularly to the extent that Why didn't you raise that issue in the district court? We did raise it in the district court once the retrospective damages were raised. In fact, we How far along in the district court had the case gotten before you raised that issue? Well, Your Honor, actually we raised it as an affirmative defense in the answer and then about a year into the case we made a motion for summary judgment and argued it at that time. Was it raised in your summary judgment motion? I believe it was, Your Honor. Okay. Are you sure? Not entirely, Your Honor. All right. I know that we So if I look at your summary judgment motion, I'm going to find in there an argument that the Eleventh Amendment protects the district. Is that right? I would not wish to firmly You wouldn't want to stake your life on that, would you? No, I wouldn't. All right. Thank you. First case. Thank you, Your Honor. Very briefly, Your Honors. I'd like to request that the court again look at the Connell case and the Minnesota chapter case that's cited in our brief. Relative to the Connell case and the Wolke and Romero case, the points that I want to make here are the law is slam dunk. A union outside the construction industry cannot just go to a party and ask them not to deal with those who are nonunion. That's absolutely illegal, anti-competitive, antitrust violation, everything. Why did the Supreme Court rule that way and why is federal labor law set up that way? When a union can do that, as the Supreme Court discusses in both Connell and the Wolke and Romero Supreme Court cases, it gives the union a huge what's called top-down organizational weapon that essentially forces employees against their will to have to join a union because that's the only way the employer can do business. That's why you have these very narrow exceptions in the construction industry that must be met in order to obtain what otherwise is considered a very anti-competitive, very unfair thing. I would disagree with Mr. Vandernat in that it's not form over substance. The building trades can't go to the Los Angeles Rams or what used to be the Los Angeles Rams or the San Diego Chargers and say we want you to enter into a refusal to deal agreement with us and not do business with any nonunion contractor if you're going to build a new stadium because the Chargers are not an employer in the construction industry. And the courts over and over again say that's very important. So I will close by this. I really think that that is the dilemma or the intellectual challenge that this court has got to address, and that is can you be engaging in protected market participation proprietary conduct as a public entity when that conduct would be illegal if conducted by a private entity? And we submit to your honors that that cannot be fairly considered market participation, and if it's not, then this case has to go back. Thank you. Thank you. We appreciate your arguments on this case. Interesting case. And it's submitted. Our next case is Bateman v. American Multi-Cinema, Inc.
judges: Walter, Fletcher B. , Paez